

AO 106 (Rev. 06/09) Application for a Search Warrant

**CASE UNSEALED PER ORDER OF COURT** 11/16/2016

# UNITED STATES DISTRICT COURT

for the

Southern District of California



FILED

SEP 3 0 2015

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

GOOGLE, INC., 1600 AMPHITHEATRE PARKWAY,
MOUNTAIN VIEW, CA 94043

)
)
)
)
)

Case No.

**'15 MJ 2936**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4

located in the ____Northern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-4

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC s. 1001 | Making a False Statement to a Federal Agency |
| 18 USC s. 1341, 1343 | Mail & Wire Fraud |
| 26 USC s. 7201 | Attempt to Evade or Defeat Income Tax |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_signature_

*Applicant's signature*

Aaron Moore, S.A., U.S. Department of Agriculture, OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/30/15

_signature_

*Judge's signature*

City and state: San Diego, California

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

① KCM



# AFFIDAVIT

I, Aaron Moore, being duly sworn, state as follows:

# INTRODUCTION

## A.    Training and Experience

1.    I am a Special Agent (SA) with the U.S. Department of Agriculture (USDA), Office of Inspector General (OIG), Office of Investigations, and have been so employed since October 2003.  I hold a Bachelor of Arts degree in Biology and a Master's degree in Public Administration.  I am a graduate of the Federal Law Enforcement Training Center's basic criminal investigation course at Glynco, Georgia, as well as the academy for Special Agents assigned to the Inspector General.  At OIG, I have conducted or participated in many criminal investigations and executed numerous search warrants involving fraud perpetrated against USDA programs.  The crimes I have investigated include financial crimes, government benefit fraud, employee misconduct, grand theft, animal welfare offenses and fraud by computer access.  I have had formal training and experience in financial crime investigations.   In the course of my investigations, I have conducted financial fraud undercover operations, made arrests, and seized evidence of violations of law.

## B.    Purpose of This Affidavit

2.    I make this affidavit in support of an application for a search warrant for the following four Internet Service Providers (collectively, the "ISPs"), as described in

1

Attachments A-1 through A-5, to search the following six email accounts, described in Attachments B-1 through B-5 (collectively, the "Subject Accounts"):

| ISP | Subject Account |
|-----|-----------------|
| **Yahoo! Inc.**<br><br>*Attachment A-1* | **bglenno1@yahoo.com**<br>("Subject Account #1" or "SA1")<br>*Attachment B-1* |
| **Yahoo! Inc.**<br><br>*Attachment A-2* | **wwcllcsd@yahoo.com**<br>("Subject Account #2" or "SA2")<br>*Attachment B-2* |
| **Inbox.com**<br><br>*Attachment A-3* | **gosborne@inbox.com**<br>("Subject Account #3" or "SA3")<br>*Attachment B-3* |
| **Google, Inc.**<br><br>*Attachment A-4* | **darrenschwartz430@gmail.com**<br>("Subject Account #4" or "SA4")<br>*Attachment B-4* |
| **Microsoft**<br><br><br><br>*Attachment A-5* | **glenn@worldwideconnectllc.com**<br>("Subject Account #5" or "SA5")<br>**glennsr@worldwideconnectllc.com**<br>("Subject Account #6" or "SA6")<br>*Attachment B-5* |

Based on the information below, I submit that there is probable cause to believe that the four ISPs' servers and records will contain evidence of the following crimes: 18 U.S.C. § 287 (false claim); 18 U.S.C. § 371 (conspiracy to defraud the United States and commit other offenses); 18 U.S.C. § 666(a)(1)(A) (theft concerning federal program); 18

U.S.C. § 1001 (false statements); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1343 (wire fraud).

3.     All the conclusions and beliefs set forth in this affidavit are based on my training and experience, conversations with other agents who have extensive experience in fraud investigations, including the Federal Bureau of Investigation, and the U.S. Postal Inspection Service, and my knowledge of the facts of this investigation. All of the dates, times, and amounts listed in this affidavit are approximate. This affidavit sets forth only the facts necessary to support the issuance of the requested search warrant; it does not include each and every fact known to me concerning this investigation.

## PROBABLE CAUSE

### A.     Introduction

4.     As outlined below, this ongoing investigation has developed probable cause to believe that Glenn Osborne, Sr. (Senior), Glenn Osborne, Jr. (Junior), and Darren S. Schwartz (Schwartz) obtained millions of dollars of USDA contracts for a new company they had created by falsifying their experience and the company's business history and financial statements. The Osbornes then diverted or embezzled substantial sums from the company to themselves, while the company ran the contracts into the ground and failed to complete them. By the time the contracts were terminated, the Osbornes had pocketed hundreds of thousands of dollars. Their suppliers and financing company, on the other hand, had suffered losses exceeding that amount.

5.   The investigation was initiated in March 2015 based on information provided by Schwartz. By that time, the USDA contracts discussed below had all been terminated.   Schwartz is currently cooperating with the investigation, although he has not entered into a cooperation or proffer agreement and has received no promises or benefits in exchange for his cooperation. Schwartz met with Junior on May 14, 2015; that meeting was audio recorded. Agents met with Senior on July 29, 2015, and with Junior on September 1, 2015. Those meetings were also audio recorded. Statements made at these meetings, and by Schwartz during separate meetings with agents, are discussed below.

**B.   Background**

### a.   *Contracting with USDA*

6.   USDA's Agricultural Marketing Service (AMS) purchases a wide array of domestic commodity food products based on competitive bids submitted by approved vendors.  To become an approved vendor, an AMS contracting officer must determine that a company is qualified, under part 9 of the Federal Acquisition Regulations (FAR). The qualification process involves several steps.

### i.   *Financial Statements Required for Approval to Bid*

7.   Prospective vendors must register in the online System for Award Management (SAM), where they list basic business information, including individual points of contact, and attest that their enterprise will comply with applicable federal

regulations.  In particular, a prospective vendor must certify its capability to perform (per FAR 9.104-1 and 9.104-3(b)), by providing, on signed company letterhead, a description of the company's historical business experience.  Prospective vendors are also required to submit three reference letters from their prior customers, involving trade in similar products.

8.     The AMS contracting officer must make an express determination of financial responsibility before the prospective vendor can submit bids.  The prospective contractor must demonstrate that it has adequate financial resources to perform, including sufficient available working capital and satisfactory credit.  A prospective vendor must also provide its most current, complete, comparative financial statement, compliant with generally accepted accounting principles (GAAP).  Currently, USDA requires statements to be audited or reviewed by an independent certified public accountant (CPA) in accordance with standards set by the American Institute of Certified Public Accountants (AICPA), although at the time of the submissions discussed below, it was not universally required that the statements be audited.  In all events, however, the statements must include at least a balance sheet, profit and loss statement, statement of cash flows, statement of retained earnings, and any pertinent notes.

9.     Once approved, vendors are added to a qualified bidders list, and granted access to a web-based platform (Web-Based Supply Chain Management System, or

WBSCM) to submit future bids on contract solicitations. Based on my training and experience, and conversations with USDA personnel reviewing qualifications submissions and administering contracts, I know that USDA and AMS rely on the accuracy of information submitted by proposed vendors in evaluating proposals. In particular, USDA and AMS rely on the integrity of proposed vendors in submitting accurate financial records and describing a history of successful business dealings in determining whether to enter into contracts.

### ii. *Procurement Process for Approved Bidders*

10.     Once approved, vendors can bid on solicitations as part of the regular procurement process. The AMS procurement process typically begins with an announcement that it plans to buy a particular type of food. AMS posts specific solicitations on WBSCM for specific products, amounts, destinations, and delivery time, and invites vendors to bid on meeting the solicitations. Vendor bids include price quotes, maximum volume limits, and delivery constraints. Contracts are awarded by AMS based on the bids, and other factors like past performance.

11.     AMS requires winning contractors to perform according to contract terms— and deviations from those requirements must be approved by "waivers" issued by USDA, which are uncommon. Performance issues must be addressed between the contractor and the relevant AMS contracting officer. AMS may assess penalties for, among other things, late delivery.

6

12.    After the product is delivered under the contract, the contractor submits its invoices via WBSCM.  AMS pays invoices according to its own prompt payment rules.

### b. *Purchase Order Financing (or Factoring)*

13.    Contractors with limited liquidity or credit sometimes use "purchase order financing" or "factoring."   Typically, the company provides its financier proof of a contract or purchase order, and assigns the financier the right to receive future payments under the contract.  In exchange, the financier advances some portion of payment to the company upon some triggering condition, such as product delivery and invoicing.  This enables the company to receive cash faster than it would waiting for payment under the contract—which may take 30 or 60 days, or even longer.

14.    For its part, USDA recognizes notices of assignment between contractor and financing company.  Under a duly filed notice of assignment, USDA will pay the financing entity directly based on invoices submitted by the contractor.

### C.    Junior and Schwartz Form WWC with Senior's Help

15.    According to statements from Schwartz, who is currently cooperating with the investigation, Schwartz and Junior knew each other as classmates from the University of California, Santa Barbara.  Junior later introduced Schwartz to Senior. Senior and Junior always appeared, to Schwartz, to be visibly wealthy.  For example, Junior drove a Hummer when Schwartz knew him at college.  Schwartz has stated that he reconnected with Junior around the time Schwartz was finishing law school in about

2012. According to public records, Schwartz was admitted to the California bar in June 2013, and is currently an active member.

16.     Senior operates a business called Osborne Management Group (OMG), as he, Junior and Schwartz have all stated. Senior largely operated the business from his prior residence in Rancho Santa Fe, California, according to Schwartz, whom Senior hired to work for OMG in about August 2012. Junior also told agents in a September 1, 2015 meeting that Senior ran OMG from Senior's residence, but Senior has claimed to agents at a July 29, 2015 meeting that he operated OMG from shared office space at 525 5th Avenue in downtown San Diego, as well as a PO Box that agents have identified in Rancho Santa Fe. According to USDA records and files from the Defense Logistics Agency, Senior is presently excluded or debarred from contracting with the United States (from November 2013 to October 2016) because of an exclusion order entered after he suffered a default judgment in civil court.

17.     In 2012, Schwartz and Junior created a limited liability company called Worldwide Connect (WWC). According to records from the Delaware Secretary of State, Worldwide Connect LLC was formed September 18, 2012, with listed members Darren S. Schwartz and Glenn Osborne. The company was registered to do business in California on June 17, 2013, according to California Secretary of State records.

18.     As Senior told agents, Junior essentially ran WWC, functioning as its chief operating officer.   Junior similarly explained that he ran everything and took on the workload himself because Schwartz was not sharing the load.

19.     Senior and Junior both claimed Schwartz did little for WWC.  According to Schwartz's own statements, he handled some aspects of company sales.  Schwartz was also sometimes described (including in some of his email signature blocks) as the company's "Chief Legal Officer."  On the other hand, Schwartz has explained that he rendered no actual legal advice to the company.

20.     According to statements from Schwartz and Junior, Senior handled the accounting for WWC.  Junior claimed to agents that Senior had done the company's accounting, using the accounting software Peachtree, on a dedicated laptop that is currently in Senior's possession.  According to Schwartz, Senior later told an auditor from WWC's financing company that Peachtree had "crashed" when she sought certain WWC financial records.  Senior himself told agents that he handled vendor payments for WWC, explaining that he would sometimes write checks to vendors and suppliers for Junior or Schwartz to sign.  Other times, Junior or Schwartz would endorse blank checks that Senior would complete.  Junior also explained, and Schwartz confirmed, that Senior handled WWC's relationship with its financing company, Aerofund.

21.     Aerofund provided purchase order financing to WWC, based on WWC's assignment of its payment rights (along with other security, such as personal guarantees

of both Schwartz and Junior) to Aerofund.  Senior has stated that he received a modest commission from Aerofund for bringing them WWC's business.  As alleged in public filings from Aerofund's pending civil suit against WWC, Schwartz, Junior and Senior, Aerofund essentially contracted with WWC to "purchase" its accounts receivable by advancing funds to WWC upon submission of invoices that WWC said it had billed to the USDA.

### D.   WWC Submits False Financials to Qualify for USDA Contracts

22.   Schwartz explained that, in July 2013, he was directed by Junior to begin to prepare WWC to submit bids for contracts under a program with the Farm Service Agency (FSA), another USDA component.  On September 9, 2013, Junior—at Subject Account #3 (SA3)—emailed Schwartz (at SA4) a set of sample materials for iBake, which is a vendor that Senior had worked with under the auspices of OMG.  The materials included a cover letter to Betty Kunkel of the FSA.

23.   According to his own statements, Schwartz used these materials to create a cover letter for WWC's anticipated submission, also addressed to Kunkel, embellishing his qualifications in the process.  For example, the cover letter claimed that Schwartz had "2 plus years" of industry experience when in reality, Schwartz had been working intermittently with OMG for only about a year.  The letter also noted that WWC had retained OMG to consult, to draw on OMG's "20 plus years of experience with

government contracting." The letter was drafted over Junior's signature, on company letterhead bearing Subject Account #2 as the contact email address.

24.     Schwartz (at SA4) emailed the draft package to Senior (at SA1) and Junior (at SA3) on September 11, 2013.  Senior emailed back from SA1 on October 9, 2013, with a fresh draft, further exaggerating qualifications (claiming Schwartz had "3 plus years of experience within the government contracting world" and was "a specialist in marketing and consulting with different companies within the food industry, commodity industry and with hard line product companies"), and substituting Schwartz as the letter's signer.  The redrafted letter also removed the reference to OMG, and asserted instead that WWC had retained "several consulting groups with over 50 years of experience with government contracting."

25.     On November 13, 2013, Senior (at SA1) emailed Junior (at SA3) and Schwartz (at SA4) with a copy of AMS's commodity procurement regulations and vendor qualification requirements.   Among other things, the vendor qualification requirements specify that:

> Under penalty of perjury, each qualification package must be submitted and signed by an individual who has the legal authority to contractually bind a prospective contractor on whose behalf that information package is submitted.  If any information submitted by a prospective contractor becomes inaccurate, a prospective contractor must immediately notify the contracting officer and provide updated and accurate information in writing.

11

26.   On January 13, 2014, Junior submitted WWC's "completed AMS package" to Dianna Price at AMS by email from SA2.   The email was sent by Junior, who according to his statements and Schwartz regularly worked from WWC's business office in San Diego, to Price, who works in AMS's offices in Washington, D.C.   Therefore, there is probable cause to believe that the wire communication constituting the email traveled across state lines.  Junior also stated at a September 1, 2015 meeting with agents that he submitted this package in hard copy by Federal Express; accordingly, there is also probable cause to believe that the communication was placed in the interstate mails.

27.   WWC's ultimate application package, which was completed with several documents forwarded after the January 13 email, included (a) its SAM registration; (b) a company letter dated January 6, 2014 to Price over Junior's signature; (c) several reference letters from other companies; (d) a letter from a manufacturer-supplier indicating its willingness to supply product to WWC; and (e) WWC's most current financial statements.

28.   The SAM registration information in the AMS package listed Schwartz (at SA4) as the CEO, and as the point of contact for WWC's accounts receivable, electronic business, and government business.   It indicated the company had started business on September 18, 2012, and stated the company had recorded $1,450,000 "Total Receipts (3 year average)" and had an average of 7 employees over a 12 month average.   It also certified that the company and its principals "are not presently debarred, suspended,

proposed for debarment, or declared ineligible for the award of contracts by any Federal agency." This certification is expressly noted, in SAM, as "a material representation of fact upon which reliance was placed when making an award."

29.     The January 6, 2014 letter to Price, like the draft letter to Kunkel described above, was written on company letterhead bearing SA2 as WWC's email address. It was signed by Junior, as President of WWC. It contained the embellished qualifications discussed above, including the claims of more than ten years of experience for Junior, more than three for Schwartz, and the reference to "numerous orders in 2013" received from "State Agencies and Prisons, and from Grocery Chains and Food Supply Companies."

30.     On February 18, 2014, Junior emailed Price again from SA3, providing updated information about WWC's completed financial statements, which were still outstanding. WWC had originally submitted half-year financials through June 30, 2013 with the January 13, 2014 package. Price replied that AMS could accept unaudited financial statements, and requested WWC's statements for the year ending December 31, 2013.

31.     The same day, February 18, 2014, Junior (at SA3) sent Schwartz (at SA4) draft financial statements in Word format. Later that day, Schwartz replied to Junior with a PDF version of the statements, to which Junior replied "Got it thanks, sent it out

. . ." The statements attached to those messages are identical to those included in AMS files with WWC's final application package.

32.     Those statements, titled "Financial Statements and Supplementary Information for the Year Ended December 31, 2013," contain detailed financial information for WWC, including the following:

- WWC posted $578,428 in sales over the 2013 calendar year;

- WWC posted net income of $114,532 over the 2013 calendar year; and

- WWC had $61,659 of "cash and cash equivalents" on hand as of December 31, 2013.

33.     In fact, according to several pieces of evidence, including bank records and statements from Schwartz, key figures in the financial statements were entirely fabricated.  Schwartz claimed to agents that WWC's sales for 2013 did not remotely approach a half million dollars.  WWC's bank account (California Bank and Trust checking account x5961) was only opened on September 12, 2013.  At the end of 2013, when the financial statements for the company reported $61,659 of "cash and cash equivalents" on hand, the account was overdrawn by $5,546.55.

34.     Junior also made repeated statements to Schwartz at a May 14, 2015 meeting implicitly acknowledging that the financials were false, claiming that he had received the financials from Senior, and strongly suggesting that Senior concocted them. The meeting was audio recorded.  Among other things, Junior said, in reference to the financial statement, "I know [it's a] legal liability, but I'm not going to sit here and cry

myself to sleep about it because it's done. I can't do anything about it." With respect to the statement, Junior said, "I didn't make this; I got this from my dad." Junior later added, "I'm not saying it's right [or] wrong. More wrong, mainly. But I can't do anything about it." When Schwartz pointed out that "knowingly submitting false information to a government entity's a big deal," Junior responded that "I get it, Darren. I'm not belittling it. I just can't do anything about it right now. ... If the fucking Department of Justice is coming after me, then I'd have a different story they can answer for you. But I don't."

35. Junior also acknowledged that the statements in the financials were material to USDA's decision whether to contract with WWC. When Schwartz pointed out that WWC "did not do that much business," Junior responded "I know. [But] this is the only way we were going to get in." Similarly, when Schwartz said that "AMS would not have approved" the business WWC conducted without the statement, Junior agreed "How are we gonna say we did thirty-forty thousand dollars of prison business and then we just won a million dollars juice contract? I mean, think about it."

36. Junior also made statements during the May 2015 meeting with Schwartz suggesting that he was aware of other companies submitting false financial information to receive government contracts. For example, Junior rationalized WWC's use of doctored financials by referencing a company called Organic Milling, which he claimed also took some liberties with its financial statements when submitting bids to USDA as a

15

new company.    Specifically, Junior stated that Organic submitted false financial statements because they could not report accurate results due to a past bankruptcy.  He added that Organic "did $30 million" of business, and received only a "little slap on the wrist."

37.    Junior likewise referenced iBake in connection with the WWC financial statements, suggesting that perhaps some sales actually transacted by iBake had been included in WWC's financial results.  At a different point during the meeting, when Schwartz asked if "iBake's numbers ... with the accountant was bullshit," Junior responded "I think so."

38.    Despite the evidence that WWC's financial statements were false, however, both Senior and Junior told agents in separate meetings (postdating Junior's recorded May 2015 meeting with Schwartz) that, as far as they knew, the information in the financial statements was accurate as presented.

**E.    Based on Its Submissions, WWC Wins Multiple USDA Contracts**

39.    Based on its submissions to various components, WWC ultimately won a total of five bids to contract with USDA, with a total value of $4,324,159.70, as reflected in USDA's records:

> 1.  A contract (no. 4100006356) to supply 17,425 cases of bottled concord grape juice, valued at $294,153.98, over a delivery period of May 15 to September 15, 2014.

2. A contract (no. 4100006424) to supply 100,450 cases of bottled apple juice, valued at $1,060,094.08, over a delivery period of June 1 to September 30, 2014.

3. A contract (no. 4100006468) to supply 41,000 cases of bottled apple juice and 11,275 cases of bottled concord grape juice, valued at $663,795.04, over a delivery period of July 1 to September 30, 2014.

4. A contract (no. 4100007285) to supply 39,975 cases of bottled apple juice and 7,175 cases of bottled concord grape juice, valued at $554,689.00, over a delivery period of October 1, 2014 to December 31, 2014.

5. A contract (no. 4100006900) to supply 97,812 cases of boxed raisins, valued at $1,751,427.60, over a delivery period of October 1, 2014 to December 31, 2014.

40. Based on a notice of assignment filed by Aerofund with USDA in April 2014, USDA paid on invoices under the contract directly to Aerofund. Aerofund, for its part, wired a portion of the face value of the invoices to WWC's California Bank and Trust checking account (x5961), when furnished with proof of invoicing. According to a preliminary analysis of bank records for that account, these payments ultimately totaled $2,738,517.74.

## F.   Senior and Junior Divert WWC Funds

41. Of the millions of dollars received by WWC from Aerofund, based on contracts with USDA, the lion's share was used to pay WWC subcontractors—as both Senior and Junior have repeatedly emphasized in meeting with agents. For example, Senior provided agents at a July 2015 meeting with a spreadsheet showing

$2,559,097.33 of purported payments to WWC's own vendors. For vendors where supporting documentation is available, the numbers summarized on Senior's spreadsheet appear to be roughly accurate.

42.    On the other hand, Senior admitted to agents that his spreadsheet did not show any salary payments to Junior or Schwartz, or consulting fees to OMG. As bank records and Schwartz's statements confirm, however, WWC paid many thousands of dollars to Senior for "consulting" services rendered by OMG. Bank records show thousands of dollars of additional payments to "Glenn Osborne," although financial analysis is ongoing to determine which of these payments were made to Senior and which to Junior. [At the May 2015 meeting, Junior told Schwartz that these payments had gone to Senior.] Finally, bank records reflect numerous purchases directly from WWC's bank account reflecting what appear to be personal expenditures—from expenses relating to Senior's newly-purchased residence, to expensive charges at San Diego area nightclubs.

43.    California Bank and Trust checking account number x5961 is held in the name of "Worldwide Connect LLC." The two signatories are Junior and Schwartz, and statements are sent to Junior's personal residence at 1050 Island Avenue, Unit 318, in San Diego, California. Schwartz has claimed to agents that he did not review the statements until he requested them directly from the bank in February 2015.

44.    The account was opened September 12, 2013 with a month-end balance of $193.  It was overdrawn by more than five thousand dollars by the end of December 2013.  In April 2014, the account began receiving incoming wire transfers from Aerofund Financial, beginning with a $26,950.80 wire on April 30, 2014.  The last incoming wire from Aerofund posted December 15, 2014 for $34,000.00; there was no deposit or credit activity at all for the following statement period.  The April 30, 2015 statement shows an ending balance of $12.45, after overdrawn monthly balances in February and March.

45.    Purchase and debit records for this account show many checks (totaling roughly $61,000) written to "Glenn Osborne," some of which have "salary" or "expense" notations in the checks' notes field.  There are also many outgoing wire transfers to "DDA Osborne J G."  Based on a preliminary financial analysis, these transfers appear to have been made to a basic checking account (also at California Bank & Trust) held by Junior personally: account x0316.  At his May 14, 2015 meeting with Schwartz, Junior acknowledged that wire transfers totaling approximately $109,000 were made to him.  In addition, many checks (totaling approximately $88,000) were written to "Osborne Management Group" or "OMG," although, again, some of these checks contain "expense" notations.  Schwartz was paid approximately $27,000.

46.    Bank records also show many apparently personal expenses charged directly to the WWC account, such as:

19

- A June 27, 2014 wire transfer of $11,800 to an escrow agent, which Schwartz claimed was to pay escrow fees associated with the purchase of a new residence for Senior at 29757 Nella Lane in Vista, California.

- A June 30, 2014 debit of $2,280 to "Sidebar," a San Diego nightclub. Similar charges were incurred on July 7, 2014 ($2,700) and September 15, 2014 ($872) at Sidebar; July 28, 2014 at "Encore Champagne Bar" in San Diego; and November 24, 2014 at Parq Restaurant and Nightclub in San Diego.

- August 11, 2014 charges for $117.20 and $472.60 to the St. Regis Monarch, a luxury hotel in Dana Point, California.

- A September 11, 2014 check to "Cali Bamboo" for $2,074.48, which Schwartz claimed was to pay for bamboo flooring in Senior's new residence on Nella Lane.

- A November 3, 2014 charge for $335 to Stephen J. Moffett, O.D., an Encinitas optometrist.

47.  Although Aerofund's incoming wires stopped in December 2014, and payments to WWC's suppliers and subcontractors stopped the same month, payments to Junior and Bryce Osborne—Junior's brother and Senior's son—continued into the following months (up to April 2015), with most denoted as reimbursement for expenses.

48.  Junior admitted the impropriety of certain payments to Senior at his meeting with Schwartz, saying "[W]hatever my dad did, we need to figure it out, pay it back, fine.  I don't disagree."  When Schwartz showed him a check apparently made out to pay for Senior's flooring, Junior admitted "he'll have to pay that back.  Agreed."  Junior further acknowledged "my mistakes, that stuff, I didn't pay my stuff the way . . .

I can pay that back.  And I'll gladly do that."  Junior denied writing checks to himself, however.

### G.    The Plan Falls Apart

49.    Although WWC contracted to supply USDA with over four million dollars of food products, WWC failed to make delivery of huge quantities of that merchandise.

50.    According to USDA's records, four of WWC's five contracts were either completely or partially terminated by the agency for default after WWC failed to deliver tens of thousands of cases of product:

1. The '6424 contract was partially terminated for default after WWC failed to deliver 19,719 cases of apple juice.

2. The '6468 contract was partially terminated for default after WWC 3,075 cases of apple and 4,100 cases of grape juice.

3. The '7285 contract was entirely terminated, with no cases delivered.

4. The '6900 contract was partially terminated for default after WWC failed to deliver 60,762 cases of raisins.

51.    Issues identified by WWC and USDA for the failure ranged from routine processing issues such as difficulties fumigating the raisins, or problems interfacing with USDA inspection staff, to more basic errors.  For example, according to extensive email communications among USDA staff, one truckload of raisins intended for delivery to Kansas City, Missouri was instead delivered to a warehouse in Kansas City, Kansas.

52.    As one example, the raisin contract was terminated by letter from the AMS contracting officer on February 2, 2015 for contractor default, after an earlier show cause

letter from January 7, 2015. The default notice recited that "out of 97,812 cases [subject to the contract], only 19,777 cases have been delivered in good condition, with 68,913 cases outstanding." [Several late deliveries were eventually credited to WWC's account.] The total contract amount terminated was $1,246,680.63, per the letter. AMS assessed $89,223.86 in liquidated damages, although those amounts were later waived, according to AMS records.

53.     WWC appealed the termination, as it was entitled to do, via a letter that Schwartz approved and signed. On the other hand, Schwartz claims that either Senior or Junior forged his signature on a similar appeal letter submitted by WWC for one of the juice contracts. The appeals were denied.

54.     In addition to falling behind on its deliveries to USDA, WWC also lagged in paying many of its suppliers and subcontractors. One supplier—Fresno Raisin Growers Cooperative (FRCG)—filed a congressional complaint in March 2015, and later, a complaint with California Department of Food and Agriculture (CDFA). When CDFA investigated, according to statements from their investigator, they determined that WWC did not hold the dealer's license required for food commodity brokers under California state law. When CDFA brought this to WWC's attention, Junior replied by mail with an incomplete license application missing the required license fee.

55.     For its part, FRGC claimed in its CDFA complaint that it has lost $434,529.52 based on significant quantities of raisins shipped under contract with WWC

for which it was never paid. Junior, on the other hand, claimed to agents that Aerofund took over managing payments to suppliers in about December 2014 when it stopped making payments to WWC. Altogether, according to records provided to agents by Senior, WWC dealt with at least the following subcontractors in attempting to fulfill its contracts with USDA:

a.   Arrow Pack
b.   Bell Chemical
c.   C.H. Robinson
d.   Diablo Valley
e.   Fresno Raisin Growers Cooperative
f.   Fruitsmart
g.   Graham
h.   Indian River
i.   Montebello
j.   Stapleton-Spence
k.   Sugar Foods
l.   USDA Inspections
m.   Valley Printing, and
n.   Valley Processing.

56.   Aerofund also claimed that it lost money in transacting with WWC, and has filed a civil suit against WWC, Senior, Junior, and Schwartz. According to Aerofund's records, it paid $2,770,858.12 to WWC. Aerofund claims that USDA only paid Aerofund $2,176,528.21, plus another $130,987.26 that it describes as "shortpaid," according to Aerofund records provided to Schwartz. [USDA records appear to corroborate these amounts.] These figures suggest that Aerofund has paid out of pocket about $463,342.65 more to WWC than it received from USDA, even though the contract between the parties only provides for Aerofund to advance 80% of contract payments to WWC, according to statements from Schwartz, Junior and Senior.

57.     Junior could not provide an explanation for this discrepancy in meetings with agents.  Senior, on the other hand, claimed that Aerofund was caught flat-footed when the contracts terminated because it had switched from paying WWC based on invoices, to paying based on purchase orders, so that when the payments from USDA stopped and product was stranded in the production pipeline unsold, Aerofund had advanced significantly more money to WWC than it could collect from USDA.  Indeed, Aerofund claims in its civil suit that several of the suppliers clawed back some of the unsold product in the production pipeline to partially cover their losses; and Aerofund is suing those suppliers to recover the amount of the clawback, which it argues were its property under its security agreement with WWC.

58.     For its part, in its civil lawsuit, Aerofund claims damages of almost $1.2 million, apparently based on the full unpaid value of the entire contract, assuming WWC had performed in full.  In his May 2015 meeting with Schwartz, Junior stated that WWC owed Aerofund roughly six to seven hundred thousand dollars.

59.     At his meeting with agents, Junior was adamant that virtually all of the money WWC received was paid out to vendors, although he could not explain the discrepancy between the amounts owed simultaneously to Aerofund and to WWC's suppliers, since USDA had paid for every shipment received.  For his part, Senior repeatedly emphasized during a meeting with agents that WWC paid out almost every dollar it received, and that "no one got intentionally cheated or defrauded, if that's where

this is going." Senior also downplayed his involvement with WWC's application to AMS, although he admitted that he looked it over before it was submitted. Similarly, he denied writing the application letter to AMS. He opined that the sales figures in the financials, which he reviewed before their submission, seemed accurate to him.

## H.   The Subject Email Accounts

### a.   *bglenno1@yahoo.com—Subject Account 1*

60.   Both Senior and Junior identified Subject Account #1 (bglenno1@yahoo.com) as Senior's principal email account. According to provider records, SA1 was created September 8, 2009, and is subscribed to by "Mr. Glenn Osborne," listing Senior's date of birth. SA1 has been accessed from an IP address that cable provider records show is subscribed to Senior at his Nella Lane residence. Non-content provider records also show that that SA1 has exchanged a great volume of email messages with Schwartz at SA4 since about September 2012.

61.   SA1 appeared as Senior's email address on the original SAM registration for WWC as the "Electronic Business" and "Government Business" points of contact for the company. SA1 was also involved in the following relevant email traffic, based on messages provided by Schwartz:

- On April 17, 2013, Senior (at SA1) forwarded a set of "Samples Documents" [sic] pertaining to federal contracting to Schwartz (at SA4) and Junior (at SA3);

- In September 2013, Senior (at SA1) exchanged messages with Aerofund about getting records in place for WWC to do business with Aerofund; later, Junior emailed from SA3, and copied Schwartz (at SA 4);

- On November 13, 2013, Senior (at SA1) emailed Schwartz (at SA4) and Junior (at SA3) with documents summarizing USDA requirements for commodities procurements;

- On June 16, 2014, Senior (at SA1) emailed Aerofund copying Schwartz (at SA 4) and Junior (at SA 3) with copies of proofs of delivery from two deliveries under the grape juice contract;

- In February 2015, Senior (at SA1) traded emails with Aerofund about possible settlement arrangements concerning the dispute with WWC; and

- In June 2015, Schwartz (at SA4) exchanged emails with Senior (at SA1) trying to set up meetings pertaining to WWC.

### b. *wwcllcsd@yahoo.com—Subject Account 2*

62.    Subject Account #2 (wwcllcsd@yahoo.com) appears to be a general-purpose email account used for WWC by its principals.  Provider records show that SA2, which was created on June 24, 2013, is subscribed to the name "Office WWC" and lists SA1 as a backup email address and Junior's birth date as its date of birth.  Non-content provider information shows that SA2 exchanged emails with multiple USDA accounts, including Betty Kunkel, Dianna Price, and others, between November 13, 2013 and April 16, 2014.  One of those messages was the January 13, 2014 submission of WWC's "completed AMS package" to Dianna Price from SA2.

### c. *gosborne@inbox.com—Subject Account 3*

63.    Subject Account #3 (gosborne@inbox.com) is Junior's principal email account.  Provider records show that SA3 is subscribed to "Glenn Osborne," and was created on August 14, 2008.  Provider records also show that SA3 has been accessed

26

from an IP address that, according to cable provider records, is subscribed to by Junior at his personal residence.

64.     Non-content provider records show that SA3 exchanged numerous emails with USDA email accounts, including the following messages, which were provided in full by Schwartz or located in USDA files:

- On February 18, 2014, Junior (at SA3) emailed USDA's Price to provide updated information about WWC's financial statements, which were still outstanding;

- On May 12, 2014, Junior (at SA3) emailed Senior (at SA1), Schwartz (at SA4), and others announcing the award of the $663,795.04 juice contract; and

- On March 2, 2015, the AMS email rescinding the liquidated damages claimed from the raisin contract was sent to SA3.

65.     Additionally, the AMS termination letter for the raisin contract, although apparently sent by certified mail, listed SA3 as the email address for "Mr. Glenn Osborne," the addressee.

### d. *darrenschwartz430@gmail.com—Subject Account 4*

66.     According to both Schwartz and Senior, Subject Account #4 (darrenschwartz430@gmail.com) is Schwartz's principal email account. Provider records indicate that SA4 was created November 26, 2007, and is subscribed to "Darren Schwartz" with Schwartz's phone listed as the recovery phone number. Non-content provider records show a myriad of emails between SA4 and USDA email accounts, beginning October 30, 2012. Among many others, SA4 was involved in the following pertinent email communications provided by Schwartz:

27

- In June 2015, Schwartz (at SA4) corresponded with Aerofund personnel concerning Aerofund's claims against WWC arising from the termination of the USDA contracts; and

- In June and July 2015, Schwartz (at SA4) traded numerous emails with Senior (at SA1) and Junior (at SA6) trying to set up meetings concerning WWC, and to discuss the status of negotiations with USDA and Aerofund.

### e. *glenn@worldwideconnectllc.com—Subject Account 5*

67.     According     to     Senior,     Subject     Account     #5 (glenn@worldwideconnectllc.com) is another email account used by Junior.   Provider records indicate that the account was created August 17, 2014, and is registered to "Glenn Osborne."   Junior has used SA5 to send pertinent emails concerning WWC and its USDA contracts, including the following messages provided by Schwartz or taken from USDA files:

- In February 2015, Junior (at SA5) emailed Aerofund concerning negotiations over WWC's contract performance;

- In June and July 2015, Schwartz (at SA4) traded numerous emails with Senior (at SA1) and Junior (at SA5) trying to set up meetings concerning WWC, and to discuss the status of negotiations with USDA and Aerofund; and

- On July 8, 2015, Junior (at SA5) emailed an application package to AMS for participation in a pilot program, over a signature block listing "Glenn Osborne, CEO" of WWC.

68.     Additionally, according to records of the Small Business Administration (SBA), Junior listed SA5 as a contact email address in a June 26, 2015 letter to the SBA's Cynthia Stiles seeking a certificate of competency to allow WWC to bid for additional contracts after the terminations discussed above.

### f.   *glennsr@worldwideconnectllc.com—Subject Account 6*

69.   Finally, Senior told agents that Subject Account #6 (glennsr@worldwideconnectllc.com) was another email address he used.   Senior corresponded with AMS contracting officer James Sprandel from SA6, including on May 19, 2015, when he claimed that "Aerofund forged the [w]aiver request . . . and forged [Junior's] signature without his knowledge or permission."   Senior also used SA6 in March 2015 for his sustained correspondence with the auditor assigned by Wells Fargo to audit Aerofund's account with WWC, according to emails provided by Schwartz.

\*     \*     \*

70.   There is probable cause to believe that emails concerning the events outlined above still exist on the servers of the ISPs as described below.  For one thing, all of the Subject Accounts (except for SA6) have been subject to preservation requests served on the ISPs since March 2015.   Furthermore, numerous facts developed during the investigation suggest that its targets are retaining some or all of their records.  First, Junior told Schwartz at their May 14, 2015 meeting that he "still [has] all the emails" concerning the negotiations with Aerofund.   Second, at his September 1, 2015 meeting with agents, Junior volunteered that he could send agents his correspondence with USDA about the request to have USDA waive the significant penalties imposed for the terminated contracts.   Third, Senior told agents at his July 29, 2015 meeting that he

keeps everything, has kept all of his emails pertaining to WWC, and could provide backup documentation concerning figures he quoted for WWC's receipts and payments to vendors. Fourth, the pendency of Aerofund's civil suit and the CDFA administrative action suggest that the parties may retain the records needed to defend the suits.

71.     Furthermore, based on my training and experience, I know that individuals who use emails to further their criminal activities tend to retain the emails in their accounts for a long time. This is particularly true of individuals involved in ongoing business fraud, like the conduct outlined herein. Based on my training and experience, and my own experience with similar technology, I also know that even when users of email accounts like the Subject Accounts delete messages from one folder, copies of the same message or another reproducing it (such as a draft, reply, or forwarded message) may be saved in another folder. Additionally, even messages marked for deletion by the user may be retained by the service provider and available for retrieval for an additional period.

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

72.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

30

## THE ISPs

73.    The ISPs are companies that, among other things, provide electronic communication services to their subscribers.  The ISPs' electronic mail services allow their subscribers to exchange electronic communications with others through the Internet.  ISP subscribers access the ISPs' services through the Internet.

74.    Subscribers to the ISPs use screen names during communications with others.  The screen names may or may not identify the real name of the person using a particular screen name. Although the ISPs require users to subscribe for accounts, the ISPs do not verify the information provided by the subscriber for their free services.

75.    At the creation of an ISP account and for each subsequent access to the account, the ISP logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet.   IP addresses are leased to businesses and individuals by Internet Service Providers.  Obtaining the IP addresses that have accessed a particular ISP account often identifies the Internet Service Provider that owns and has leased that address to its customer.    Subscriber information for that customer then can be obtained using appropriate legal process.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

76.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.

The personnel of the ISPs are not.   It would be inappropriate and impractical for federal agents to search the vast computer network of each of the ISPs for the relevant accounts and then to analyze the contents of those accounts on the ISPs' premises.   The disruption to the ISPs' businesses would be severe.

77.   Therefore, I request authority to seize all content from the ISPs' accounts, as described in Attachments B-1 through B-5.   In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISPs, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, USDA OIG seeks authorization to allow the ISPs to make a digital copy of the entire contents of the accounts subject to seizure.   That copy will be provided to me or to any authorized federal agent.   The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachments B-1 through B-5. Relevant electronic records will be copied to separate media.   The original media will be sealed and maintained to establish authenticity, if necessary.

78.   Analyzing the data to be provided by the ISPs may require special technical skills, equipment, and software.   It may also be very time-consuming.   Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.   Merely finding a relevant "hit" does not end the review process.

Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

79. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISPs, examiners may need to review each record to determine if it is responsive to Attachments B-1 through B-5. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this Court.

80.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

81.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## REQUEST·FOR SEALING AND DELAYED NOTICE

82.     This is an ongoing criminal investigation of which (I believe) the targets— other than Schwartz—are currently unaware.  Although agents have met with both Senior and Junior, neither was told (or seemed to be aware) that a criminal investigation is underway.  It is very likely, based upon the above, that evidence of the crimes under investigation exists on computers subject to the control of the targets.  Indeed, Senior told agents some of his files are "in the cloud."  There is reason to believe, based on the above, that premature disclosure of the existence of the warrant will result in destruction or tampering with that evidence and seriously jeopardize the success of the investigation. For example, according to emails and statements from Schwartz, Senior has withheld substantial information from the financial auditor reviewing Aerofund's account with WWC, and the information he has provided has been heavily redacted to obscure

34

damaging information.  Similarly, in his May 2015 meeting with Schwartz, Junior stated that if anyone started investigating the company financials, "you're a lawyer, we'll come up with some legal plan or you can just jump ship, fine."  Accordingly, it is requested that this warrant and its related materials be sealed until further order of the Court.  In addition, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service providers to whom this warrant is directed not to notify anyone of the existence of this warrant, other than their personnel essential to compliance with the execution of this warrant, before March 30, 2016.

## CONCLUSION

83.    Based on the foregoing, I submit that there is probable cause to believe that Senior, Junior and Schwartz obtained contracts for WWC by fraud, and that Senior and Junior then diverted or embezzled significant sums while exposing their vendors and suppliers to significant losses.

84.    I conclude that there is probable cause to believe that Senior and Junior have engaged in violations of criminal law, namely, 18 U.S.C. § 287 (false claim); 18 U.S.C. § 371 (conspiracy to defraud the United States and commit other offenses); 18 U.S.C. § 666(a)(1)(A) (theft concerning federal program); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1343 (wire fraud).

85.     I also conclude that there is probable cause to believe that the Subject Accounts contain or constitute evidence of such offenses.  Based on my training and experience, and based on the facts set forth above, I further conclude that categories of information listed on Attachments B-1 through B-5 will be contained in the Subject Accounts located on the Internet Service Providers' servers as described in Attachments A-1 through A-5.

Respectfully submitted,

Aaron Moore
Special Agent, USDA OIG

Subscribed and sworn to before me on ___9/30___ , 2015

Hon. Barbara Lynn Major
United States Magistrate Judge

1
2
3

## **ATTACHMENT A-4**

4
5

Google, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

46

## ATTACHMENT B-4

### I.   Service of Warrant

The officer executing the warrant shall permit Google, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.   Items Subject to Seizure

All subscriber and/or user information, all electronic mail, images, text messages, histories, buddy or friend lists, profiles, method of payment, detailed billing records, access logs, transactional data and any other files or records associated with the following accounts (the subject email account):

**darrenschwartz430@gmail.com**

### III.   Search and Seizure of Data by Law Enforcement

Law enforcement shall conduct any search of the data pursuant to the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of September 1, 2012 to date of the issuance of the warrant and to the seizure of:

a.   Communications, records and attachments concerning Worldwide Connect LLC [WWC], limited to those relating to

    i.   Applications of any kind, including drafts;

    ii.   Financial statements, tax returns or records, bank records, accounting records, or any communications with any accountant, auditor or financial statement preparer;

    iii.   Any payments made or claimed by WWC or using WWC funds, whether described as business or personal expenses, salary, or benefits;

    iv.   Any incoming receipts or sales or other income generated by WWC, however described, including any income reflected in periods described in any financial statements or accounting records; or

    v.   Any lines of credit, loan applications, financing (including purchase order financing or factoring) or any statements made in connection with same;

b. Communications, records and attachments concerning any companies or entities associated or doing business with WWC, including

| | | | | |
|---|---|---|---|---|
| i. | Arrow Pack; | | viii. | Indian River; |
| ii. | Bell Chemical; | | ix. | Montebello; |
| iii. | C.H. Robinson; | | x. | Stapleton-Spence; |
| iv. | Diablo Valley; | | xi. | Sugar Foods; |
| v. | Fresno Cooperative Raisin Growers; | | xii. | USDA Inspections; |
| | | | xiii. | Valley Printing; and |
| vi. | Fruitsmart; | | xiv. | Valley Processing; |
| vii. | Graham; | | | |

c. Communications, records and attachments concerning any investigation into WWC; Glenn Osborne, Sr.; Glenn Osborne, Jr.; or Darren Schwartz; or any pending civil suit; or any audit of WWC or the individuals named in this paragraph, including the audit conducted at the behest of Wells Fargo;

d. Communications, records and attachments concerning iBake, including applications for government contracts or financial statements in support of same;

e. Communications, records and attachments concerning Organic Milling, including applications for government contracts or financial statements in support of same; or

f. Communications, records and attachments concerning Aerofund, including commissions paid by Aerofund to Glenn Osborne, Sr.;

which constitute evidence of a scheme to obtain government contracts by fraud; embezzling or diverting the resulting payments; defrauding business partners, suppliers or subcontractors; and violations of one or more of the following federal crimes: making a false claim, in violation of 18 U.S.C. § 287; conspiracy to defraud the United States and commit other offenses, in violation of 18 U.S.C. § 371; theft concerning a federal program, in violation of 18 U.S.C. § 666(a)(1)(A); making a false statement to a federal agency, in violation of 18 U.S.C. § 1001; mail fraud, in violation of 18 U.S.C. § 1341; and wire fraud, in violation of 18 U.S.C. § 1343.